UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL VAN LINN,

        Plaintiff,

    v.                                  Case No. 22-C-434

OCONTO COUNTY and
NICHOLAS SCHOOL,

        Defendants.

## DECISION AND ORDER

      This is a civil rights action brought under 42 U.S.C. § 1983 in which the plaintiff claims that a deputy sheriff violated his Fourth Amendment rights by ordering a warrantless blood draw at the hospital to determine his blood alcohol concentration after he crashed his vehicle and was arrested for Fifth Time Operating While Intoxicated (OWI 5th). The case is before the court on cross motions for summary judgment. For the reasons that follow, the defendants' motion will be granted and the plaintiff's denied.

## BACKGROUND

      Shortly before 2:00 a.m. on March 26, 2017, Daniel Van Linn made a 911 call to report that he had been involved in a multi-vehicle accident and that there were injuries. Defs.' Proposed Findings of Fact (DPFOF) ¶ 6. The location Van Linn gave was in rural Oconto County on Section 4 Lane in the Town of Mountain, Wisconsin. *Id.* ¶ 7. Oconto County Deputy Sheriff Nicholas School was the first law enforcement officer to arrive at the location at 2:18 a.m. *Id.* ¶ 9. Upon his arrival, Deputy School did not observe any vehicles. Eventually, he discovered a white Suzuki SUV some distance off the roadway that had apparently crashed into someone's unoccupied cabin.

*Id.* ¶ 14; Dkt. No. 17-2 at 3–5. Following the apparent path of the vehicle, it was determined that the SUV had crossed over the centerline of Section 4 Lane into the ditch on the south side of the road and struck a tree. It then returned to the road, crossed both lanes of traffic into the ditch on the north side of the road, traveled across a service road, into an open field, and crashed into the structure where it finally stopped. No one was occupying the vehicle when Deputy School came upon it, but blood could be seen on the inside. DPFOF ¶¶ 15–16.

At 2:38 a.m., Deputy School learned from a radio transmission that an individual had been located on the south side of Section 4 between 200 and 250 yards from the crashed SUV. *Id.* ¶ 17. Deputy School proceeded to that location where he observed a male, later identified as Daniel Van Linn, with cuts on his hands and face, receiving emergency medical care from Mountain Ambulance personnel. *Id.* ¶¶ 18–19. Van Linn's speech was slurred, and he was difficult to understand. Deputy School detected the odor of alcohol on Van Linn's breath but spoke to him very briefly because Van Linn was having a hard time breathing and appeared to be in severe pain. *Id.* ¶¶ 20–21. Van Linn told Deputy School that he had been out for a walk and denied that he had been driving. He also stated that he had consumed a couple of beers. *Id.* ¶¶ 22–23. Deputy School reasonably concluded from other statements Van Linn made and the surrounding circumstances that there was probable cause to arrest Van Linn for OWI. *Id.* ¶¶ 25–26.

Mountain Ambulance personnel began transporting Van Linn to St. Clare's Memorial Hospital, located in Oconto Falls, at 2:58 a.m. *Id.* ¶ 30. During the transport, the ambulance was diverted from St. Clare's Memorial Hospital to ThedaCare Medical Center, a trauma center located in the City of Shawano in adjoining Shawano County. *Id.* ¶ 32. The ambulance carrying Van Linn arrived at ThedaCare Medical Center at 3:46 a.m., and Deputy School arrived less than five minutes later. *Id.* ¶ 38.

Deputy School saw Van Linn in the emergency room of the hospital and advised him at that time that he was under arrest for OWI 5th. *Id.* ¶ 39. Deputy School read to Van Linn an "Informing the Accused" form and requested his consent to submit to a chemical analysis of his blood alcohol content (BAC). *See* Wis. Stat. § 343.305(4). Van Linn refused to consent. *Id.* ¶¶ 40–41. Deputy School then telephoned Lieutenant Keven Thomson to discuss the surrounding circumstances and determine whether exigent circumstances existed so as to allow them to proceed with a warrantless blood draw. They concluded that such circumstances did exist, and Deputy School directed medical personnel at ThedaCare Medical Center to draw a sample of Van Linn's blood. The blood draw was performed at 4:15 a.m. *Id.* ¶¶ 41–43. The results of the blood test revealed that Van Linn's BAC was 0.226, almost three times the legal limit and more than eleven times the legal limit for a person with four prior convictions for OWI. *See* Wis. Stat. § 340.01(46m)(a) (2019–20); *State v. Van Linn*, 2022 WI 16, ¶¶ 3–4, 401 Wis. 2d 1, 971 N.W.2d 478. Law enforcement also determined that Van Linn's driving privileges had been previously revoked. *Van Linn*, 401 Wis. 2d 1, at ¶ 3.

In the State criminal prosecution against him for OWI 5th, Van Linn moved to suppress the results of the blood draw on the ground that the search was illegal. The circuit court granted Van Linn's motion, rejecting the State's argument that the blood draw was justified under the exigent circumstances exception to the warrant requirement.[1] *Id.* at ¶ 6. The State chose not to appeal the circuit court's ruling that the warrantless blood draw violated Van Linn's Fourth Amendment rights and instead subpoenaed the hospital's records which included its diagnostic

---

[1] The state court's holding that Deputy School's search violated the Fourth Amendment is not given preclusive effect here since Deputy School was not a party to the criminal proceeding against Van Linn. *See Kunzelman v. Thompson*, 799 F.2d 1172, 177 (7th Cir. 1986) (holding "the criminal defendant turned plaintiff may not assert collateral estoppel against the state on issues requiring the state to shoulder the burden of proof").

3

blood test. *Id.* at ¶¶ 7–8. After unsuccessfully seeking the suppression of the hospital records, Van Linn pleaded guilty to the charge of OWI 5th and appealed the circuit court's denial of his motion to suppress the hospital records. Both the Wisconsin Court of Appeals and the Wisconsin Supreme Court rejected his challenge and affirmed his conviction. *Id.* at ¶ 19.

In his federal civil rights suit, Van Linn claims that Deputy School violated his rights under the Fourth Amendment by subjecting him to an unlawful search and seizure when he ordered a phlebotomist to draw his blood against his will and without a warrant. He alleges that Deputy School knew that the search was not justified by exigent circumstances and that he acted with callous indifference to Van Linn's federal protected rights. He seeks both compensatory and punitive damages, as well as his costs and attorneys' fees. And because Deputy School was acting within the scope of his employment at the time he violated his rights, Van Linn claims that Oconto County has a duty to indemnify him for any judgment entered against him under Wis. Stat. § 895.46.

**LEGAL STANDARD**

Summary judgment shall be granted when the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences from it in the light most favorable to the nonmoving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical

4

doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Fourth Amendment Violation

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. A blood draw is a search of the person. *Schmerber v. California*, 384 U.S. 757, 767 (1966); *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). By its terms, the Fourth Amendment does not require that law enforcement officers obtain a warrant before conducting a search; however, the Supreme Court has inferred that a warrant is generally required, subject to several exceptions the Court has recognized over the years. *Birchfield v. North Dakota*, 579 U.S. 438, 456 (2016).

One such exception occurs when there are exigent circumstances. "The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." *Id.* (citing *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). "It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence." *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 460 (2011)). When such an emergency arises, "[a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Ultimately, the reasonableness of the officer's determination that the circumstances justifying the warrantless search existed "'must be judged

5

Case 1:22-cv-00434-WCG   Filed 04/07/23   Page 5 of 16   Document 35

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396–397 (1989)).

In *Schmerber*, the Court upheld a warrantless blood draw under circumstances remarkably similar to those in this case. In *Schmerber*, the petitioner and a companion had been drinking at a tavern and bowling alley. 384 U.S. at 758 n.2. After they left at around midnight, the car the petitioner was driving skidded, crossed the road, and struck a tree. Both the petitioner and his companion were injured and taken to a hospital for treatment. *Id.* The police officer who arrived at the scene shortly after the accident smelled alcohol on the petitioner's breath and noticed that his eyes were bloodshot, watery, and glassy. The same officer saw the petitioner again at the hospital, within two hours of the accident, and noticed similar symptoms of drunkenness. *Id.* at 768–69. The officer placed the petitioner under arrest and, despite the petitioner's refusal to consent, directed a physician to draw a blood sample. *Id.* at 759.

In rejecting the petitioner's challenge to the search, the Court noted that the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770 (internal quotation marks omitted). The risk that evidence would be lost arose as a result of the fact "that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* "Particularly in a case such as this," the Court observed, "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Id.* at

770–71. Given these circumstances and also in light of the fact that blood draws conducted by medical personnel were a safe and common part of routine health care, the Court concluded that "the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." *Id.* at 771.

Because it has not been overturned, *Schmerber* would seem to doom Van Linn's claim that Deputy School violated his Fourth Amendment rights by ordering a warrantless blood draw. The facts of this case suggest a greater exigency than those of *Schmerber*. The petitioner in *Schmerber* slid into a tree at around midnight in Los Angeles, California, one of the most populous cities in the country with one of the largest police departments, and was presumably taken to a nearby hospital. Van Linn drove off the road in rural Oconto County at 2:00 a.m. and had to be transported to a trauma center in another county. It was almost an hour before he and his vehicle were located and the transport to the hospital began, and almost another hour before he arrived at the hospital. Yet, Van Linn contends there was plenty of time for Deputy School to prepare a warrant and wake up a judge to review and sign it.

Notwithstanding the fact that the exigency Deputy School faced in this case was greater than that faced by the officer in *Schmerber*, Van Linn argues that *Schmerber* does not control. Van Linn argues that this case is controlled by *Missouri v. McNeely*, 569 U.S. 141 (2013). In that case, the Court held that the natural metabolization of alcohol in the human bloodstream does not present a *per se* exigency that justifies a warrantless blood draw in every case. Instead, the Court held that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* at 157. A *per se* rule allowing a warrantless blood test for all drunk-driving suspects, the Court held, was not only overly

7

broad but would significantly "dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 158.

The facts of *McNeely*, however, are significantly different than those of both this case and *Schmerber*. *McNeely* involved what would be considered a routine drunk driving arrest. While on patrol at approximately 2:00 a.m., a Missouri police officer stopped a truck after observing it speeding and repeatedly crossing the centerline. The driver had bloodshot eyes, slurred his speech, had the smell of alcohol on his breath, and poorly performed the field sobriety tests. *Id.* at 144. Unlike this case, the arresting officer did not have to travel to the location of an alleged multi-vehicle collision, spend time looking for the vehicles involved and the injured parties, and then wait for rescue workers to provide medical care to the driver and transport him to a hospital in another county.

More recently, in *Mitchell v. Wisconsin*, 139 S. Ct. 2525 (2019), the Court addressed the issue of whether a warrant was required for a blood test when the suspect is unconscious. In that case, police received a report that the petitioner, "appearing to be very drunk, had climbed into a van and driven off." *Id.* at 2532. The responding officer found the suspect wandering near a lake. He was stumbling, slurring his words, and could hardly stand without the support of two officers. A non-evidentiary preliminary breath test registered a blood alcohol content level of 0.24%, three times the legal limit in Wisconsin. When the suspect proved too lethargic even to take an evidentiary breath test at the stationhouse, the officer drove him to a nearby hospital for a blood test. By the time they arrived, the suspect had passed out. The officer nevertheless read the official "informing the accused" form, and when the suspect failed to respond to the request for his consent, the officer directed the hospital staff to draw a blood sample. *Id.*

8

In upholding the search there, the Court noted that the case was much closer to *Schmerber* on the exigency spectrum than *McNeely* because Mitchell's medical condition, like the car accident in *Schmerber*, "heightened [the] urgency." *Id.* at 2533. Because the suspect was unconscious, the arresting officer had "no reasonable opportunity to give him a breath test using 'evidence-grade breath testing machinery'" at the police station where such equipment is normally maintained.[2] *Id.* at 2534. When a breath test is unavailable, the *Mitchell* plurality noted, "a blood draw becomes necessary." *Id.* at 2536 (internal citation omitted). Drawing further on *Schmerber*, the *Mitchell* plurality also noted that the driver's unconsciousness, like injuries from a car accident, is itself a medical emergency necessitating a trip to the hospital. "Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value." *Id.* at 2537–38. "Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency," the *Mitchell* plurality noted, "so does the condition of an unconscious driver bring his blood draw under the exception." *Id.* at 2538. In such a case, as in *Schmerber*, the plurality concluded "an officer could 'reasonably have believed that he was confronted with an emergency.'" *Id.* (citing *Schmerber*, 384 U.S. at 770).

---

[2] *Mitchell* seems to assume that police generally use devices that test a suspect's breath to obtain admissible evidence of a suspect's intoxication in OWI cases. It appears, however, that blood tests are the primary tests used in many Wisconsin counties because the machines that measure BAC in breath are less reliable and cannot detect the presence of controlled substances that can similarly impair one's ability to drive safely and thus also constitute evidence of OWI. *State v. Krajewski*, 2002 WI 97, ¶ 40, 255 Wis. 2d 98, 648 N.W.2d 385; *State v. Drews*, 2000 WI App 233, ¶ 6, 2000 WL 1124237 (Wis. Ct. App. Aug. 9, 2000) (unpublished).

*Mitchell*, like *Schmerber*, supports the conclusion that Deputy School did not violate Van Linn's Fourth Amendment rights in directing the medical staff at ThedaCare Medical Center to draw a blood sample to determine his BAC. In *Mitchell*, the Court held: "When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." *Id.* at 2539. Here, there is no dispute that Deputy School had probable cause to believe that Van Linn had committed the crime of OWI 5th. There is likewise no dispute that he required hospitalization, though not because he was unconscious or in a stupor.[3] Under these circumstances, Mitchell suggests that a warrantless blood draw is lawful unless the suspect can "show [1] that his blood would not have been drawn if police had not been seeking BAC information, and [2] that police could not have reasonably judged that a warrant application would interfere with other pressing needs of duties." *Id.*; *see also State v. Mitchell*, 2021 WI App 31, ¶ 16, 404 Wis. 2d 103, 978 N.W.2d 231. Neither condition is met here.

As to the first condition, Van Linn is clearly unable to show that his blood would not have been drawn even if police had not been seeking BAC information, since it is clear from the Wisconsin Supreme Court's decision affirming his conviction that blood would have been drawn in any event. Indeed, Van Linn's state court conviction was based not on the blood drawn at Deputy School's direction, but on the hospital's diagnostic blood test that was subpoenaed by the

---

[3] Van Linn reads *Mitchell* narrowly to apply "only . . . when suspects are unconscious or about to become unconscious." Pl.'s Br. in Opp'n. to Defs.' Mot. for Summ. J. at 4, Dkt. No. 24. But whether the hospitalized suspect is unconscious and unable to consent or conscious and refusing to consent, the arresting officer is confronting the same question: Is there time to get a warrant before the evidence is lost or significantly degraded?

10

State after the circuit court granted Van Linn's motion to suppress law enforcement's test results. 401 Wis. 2d 1, ¶ 7. In other words, the hospital staff determined that a blood draw was necessary in order to provide Van Linn proper care and treatment. Since Van Linn's blood was to be drawn in any event, regardless of Deputy School's interest in obtaining evidence of Van Linn's BAC, *Mitchell* suggests that the warrantless blood draw was lawful.

The undisputed evidence also establishes that Van Linn is unable to establish the second condition: "that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Mitchell*, 139 S. Ct. at 2539. Van Linn argues that the undisputed evidence shows that Deputy School could have obtained a warrant in as little as 30 minutes and that he had the probable cause needed to obtain the warrant a full hour-and-a-half before the actual blood draw occurred. Pl.'s Br. in Supp. of Mot. for Summ. J. at 1–2, Dkt. No. 20. But 30 minutes is the fastest time Deputy School stated it takes to have the warrant issued once it is prepared and arrangements made to meet with the judge. Nicholas School Dep. at 14:25–15:05, Dkt. No. 18-1. Written warrants also take time to prepare, usually on a computer at the Sheriff's Department. *See McNeely*, 569 U.S. at 155 ("Warrants inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review. Telephonic and electronic warrants may still require officers to follow time-consuming formalities designed to create an adequate record, such as preparing a duplicate warrant before calling the magistrate judge. . . . And improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest."). It should also be noted that the judges in Oconto County have not implemented a procedure that allows for the application for and issuance of OWI search warrants by telephone, e-mail, or fax. DPFOF

¶ 49. The unavailability of the kind of technology that would allow law enforcement officers to apply for search warrants remotely cannot therefore be attributed to Deputy School.

More importantly, the fact that 90 minutes elapsed between the time Deputy School had probable cause to obtain a warrant and when the blood draw occurred is irrelevant. Deputy School had no need to obtain a search warrant until Van Linn refused to consent to the blood draw. By then, it was approximately 4:00 a.m. Pl.'s Proposed Findings of Fact ¶ 31, Dkt. No. 21. Most people apparently consent to blood draws since the refusal to do so results in penalties under Wisconsin law, including the revocation of the driver's operating privilege for at least a year. Wis. Stat. § 342.305(10). In addition, the refusal itself can be used as an admission of guilt in the prosecution of the OWI charge, which can be brought even without a blood test. Wis. Stat. § 343.305(10). These are apparently strong incentives to consent to a blood draw. Deputy School estimated that of the 75 to 100 OWI investigations he was involved in, he applied for a warrant only between five and ten times. DPFOF ¶ 46. In light of this experience, it made little sense to wake up a judge and undertake the process of preparing a search warrant before it was necessary to do so.

Van Linn further argues that Deputy School should have asked him for his consent for a blood draw at the scene before he was transported to the hospital and then, if he said he intended to refuse, enlist another officer to prepare the warrant and find a judge to sign it. Pl.'s Br. in Supp. of Mot. for Summ. J. at 3–4. But again, it made little sense to ask Van Linn for consent before the blood could be drawn since there was nothing to prevent Van Linn from changing his mind even if he initially said he would consent. Under these circumstances, it makes no sense to require law enforcement officers to interrupt emergency medical personnel in the performance of their duties

by insisting that an officer read their patient an "Informing the Accused" form and requesting consent for a blood draw before the suspect is transported to the hospital.

Deputy School read Van Linn the "Informing the Accused" form as soon as it was reasonable for him to do so. It was only at approximately 4:00 a.m., when Van Linn refused to consent to a blood draw, that the need to obtain a search warrant arose. By that time, at least two full hours had passed since Van Linn drove off the road and into a structure. In discussing the matter with Lieutenant Thomson, Deputy School acknowledged that it could even have been longer since they only knew when Van Linn placed the 911 call, not when the accident actually occurred. School Dep. at 57:17–58:07. At that point, Deputy School was at ThedaCare Medical Center, almost sixty miles from the Oconto County Sheriff's Department. *See* Driving Directions from the Oconto County Sheriff's Department to ThedaCare Medical Center, GOOGLE MAPS, https://www.google.com/search?client=firefox-b-1-d&q=distance+from+ThedaCare+Medical+Center+to+Oconto+County+Sheriff+Department (last visited Apr. 6, 2023). Even aside from the time it would take to prepare the warrant and find a judge to review it, travel time alone from the Oconto County Sheriff's Department to ThedaCare Medical Center, where the blood draw was to occur, would have taken an hour, assuming Deputy School could have found another officer to prepare the warrant and drive it to him at the hospital.

In sum, based on the totality of the circumstances and given the fact that alcohol dissipates from the bloodstream, and "[e]vidence is literally disappearing by the minute," *Mitchell*, 139 S. Ct. at 2536 (quoting *McNeely*, 569 U.S. at 169 (opinion of Roberts, C.J.)), Deputy School reasonably concluded that ordering hospital personnel to draw a sample of Van Linn's blood without first obtaining a warrant was reasonable. As a result, no violation of Van Linn's rights under the Fourth Amendment occurred.

13

### B. Qualified Immunity

Even if the circumstances he confronted did not justify the warrantless blood draw, Deputy School is entitled to the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Van Linn argues that the need for a warrant in this case was clear to any reasonable officer. He contends that, in *McNeely*, "the Supreme Court drew what is perhaps one of the brightest lines ever penned in the history of Fourth Amendment jurisprudence: 'In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.'" Pl.'s Br. in Supp. of Mot. for Summ. J. at 6 (quoting *McNeely*, 569 U.S. at 152). Van Linn's contention betrays an amazing lack of awareness of what a "bright-line" rule is. Whatever else can be said about *McNeely*, it certainly did not create a bright-line rule. To the contrary, *McNeely* rejected the bright-line rule, favored by Justice Thomas, that "[b]ecause the body's natural metabolization of alcohol inevitably destroys evidence of the crime, it [by itself]

constitutes an exigent circumstance." *McNeely*, 569 U.S. at 176 (Thomas, J., dissenting). Instead, the *McNeely* majority held that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* at 156. A rule that calls for a case-by-case determination based on the totality of the circumstances is not a "bright-line" rule.

Indeed, the *McNeely* majority acknowledged that there would be OWI cases where police would be justified in ordering a blood draw without a warrant: "We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." *Id.* at 153. But what those circumstances might be would have to be determined on a case-by-case basis. And though *McNeely* can be read as a retreat from *Schmerber*, it did not overrule *Schmerber*. If anything, *Mitchell* appears to have reinforced the holding of *Schmerber*.

In light of this line of cases, it cannot reasonably be said that Van Linn's right not to have his blood drawn without a warrant under the circumstances of this case was clearly established. Van Linn seems to argue that, unless it can be shown that it would have been impossible for Deputy School to obtain a warrant before the evidence of intoxication was completely dissipated, he was required to do so. He suggests that Deputy School should have anticipated that Van Linn would refuse to consent to a blood draw, even before Deputy School had the opportunity to read him the legally mandated "Informing the Accused" form, commandeered the third shift of the Oconto County Sheriff's Department to write up a search warrant, wake up a judge to sign it, and then have it driven the sixty miles to ThedaCare Medical Center in Shawano County so that, in the event Van Linn refused, a search warrant would be available to authorize the draw. But that is not the law. The question is whether the circumstances made "obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly

15

conducted warrantless blood test." *McNeely*, 569 U.S. at 153. The ultimate test is whether the search was reasonable. *Mitchell*, 139 S. Ct. at 2534.

For the reasons set forth above, the court has concluded that Deputy School's decision to order the warrantless blood draw was reasonable under the circumstances he faced. But even if in hindsight it is determined to be otherwise, Deputy School did not act, as Van Linn alleges, "recklessly and/or with callous indifference to the federally protected rights of Plaintiff." Compl. ¶ 18. When Van Linn refused his consent, Deputy School did not ignore him and immediately order the hospital staff to perform the blood draw. He called his superior, Lieutenant Thomson, to discuss what steps he should take. They considered the circumstances of the accident, including the report of multiple vehicles, the time spent looking for other potential victims, and Van Linn's prior record. DPFOF ¶ 41. Both Deputy School and Lieutenant Thomson believed that exigent circumstances justifying the warrantless blood draw existed. *Id.* ¶ 42. Only then did Deputy School direct medical personnel to perform the blood draw. Based on these undisputed facts, even if Deputy School's decision was in error, he is immune from liability to Van Linn for any damages he claims to have sustained.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 14) is **GRANTED**. Van Linn's motion for partial summary judgment (Dkt. No. 19) is **DENIED**. The Clerk shall enter judgment in favor of the defendants dismissing all claims against the defendants on their merits and with prejudice.

**SO ORDERED** at Green Bay, Wisconsin this 7th day of April, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge